**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT
MOTHER:

**CORY A. SPREEN**
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT
FATHER:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF CHILD
SERVICES:

**MITCH GERBER**
DCS, Allen County Office
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED
Oct 17 2012, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: T.H.M., Minor Child, | ) ) ) ) | |
| T.H., Mother, and A.M., Father, | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 02A03-1202-JT-61 |
| INDIANA DEPARTMENT OF CHILD SEVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1104-JT-77

**October 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

T.H. ("Mother") and A.M. ("Father") appeal the involuntary termination of their parental rights to their child, T.M.H. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of T.M.H., born in August 2010. Although paternity was never established, Father is the alleged biological father of T.M.H.[1] The evidence most favorable to the trial court's judgment reveals that in October 2010 T.M.H. was removed from Mother's care after the local Allen County office of the Indiana Department of Child Services ("ACDCS") confirmed a report that T.M.H. had been born at home without medical assistance and that the family was unable to provide for the child's basic life necessities. In addition, on or about the same day of T.M.H.'s removal, Mother was taken into custody on an active warrant for public intoxication and was ordered to serve sixty days in jail. Father was likewise arrested on or about the same day on public intoxication and false informing charges. Father remained incarcerated for twelve days. In December 2010, Mother was arrested on new prostitution and public intoxication charges. She later pled guilty to these new charges.

Meanwhile, T.M.H. was placed in licensed foster care, and ACDCS filed a petition alleging the child was a child in need of services ("CHINS"). Following a hearing on an amended CHINS petition held in February 2011, the trial court issued an

---

[1] At the time of T.H.M.'s birth, Mother and Father had been living together and involved in a relationship for approximately five to six years. Father acknowledges T.M.H. as his biological child, but paternity was never established.

order adjudicating T.M.H. a CHINS. The court's CHINS order also acknowledged that Mother's and Father's parental rights to two of T.M.H.'s older siblings recently had been involuntarily terminated in January 2011 and that Mother had lost her parental rights to three additional children (half-siblings to T.M.H.) several years earlier.[2]

A dispositional decree was issued in March 2011 formally removing T.M.H. from Mother's and Father's care and making the child a ward of ACDCS. In addition, the trial court entered an order finding that, pursuant to Ind. Code § 31-34-21-5.6(b)(4), no reasonable efforts to reunify the child with the child's parents or to preserve the child's family were required. During a permanency hearing the following month, the court adopted ACDCS's recommendation that the permanency plan for T.M.H. be termination of parental rights and adoption.

In July 2011, Mother was arrested for failing to appear in court after missing two scheduled hearings in her criminal prostitution case. Mother pled guilty to the prostitution charge in September 2011 and was ordered to serve sixty days in jail. Also in July 2011, Mother was charged with class C felony forgery and class D felony receiving stolen property charges. Mother pled guilty to the forgery charge in October 2011, and the trial court took the matter under advisement. Mother remained incarcerated and awaiting sentencing at the time of the termination hearing.

As for Father, apart from a few weeks of incarceration in January and February 2011, Father remained out of jail during the months of November 2010 through June 2011. During this time, Father failed to fully engage in services, attending only seven of

---

[2] We note that Mother voluntarily relinquished her parental rights to one of these older children.

fifteen scheduled visits with T.M.H. Father also refused to participate in several requests for random drug screens by ACDCS. When not incarcerated, neither parent was able to achieve stable employment. In addition, Mother and Father were unable to obtain independent housing and instead rented a bedroom in a home owned and occupied by a man and his daughter, both of whom had substantiated histories with ACDCS.

ACDCS filed a petition seeking the involuntary termination of Mother's and Father's parental rights to T.M.H. in May 2011. A two-day evidentiary hearing on the termination petition was later held in August and October of 2011. At the time of the hearing, both parents were incarcerated.

During the termination hearing, ACDCS presented substantial evidence establishing that both Mother and Father had failed to demonstrate that they were willing and/or able to refrain from criminal activity. In addition, it was the general consensus of case workers and visitation supervisors that both parents remained incapable of providing T.M.H. with a safe and stable home environment. At the conclusion of the termination hearing, the trial court took the matter under advisement. In January 2012, the trial court entered its judgment terminating Mother's and Father's parental rights to T.M.H. Both parents now appeal.

**Discussion and Decision**

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here,

the trial court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services. . . .

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."  Ind. Code § 31-35-2-8(a) (emphasis added).

Mother and Father both challenge the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) of the termination statute cited above. Ind. Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B).  Because we find it to be dispositive, we limit our review to Mother's and Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether ACDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of T.M.H. outside the family home will not be remedied.

Mother argues that the trial court erred in relying on the fact she and Father were both incarcerated at the time of the termination hearing to support its conclusion that conditions resulting in the removal of T.M.H. would likely not be remedied because "no evidence was provided as to what potential sentence or plea [Mother] was expecting.  For

6

all the court knew, [Mother] could have been facing a suspended sentence with probation." Appellant Mother's Brief at 9. Mother goes on to assert that the initial reason for T.M.H.'s removal was centered on both parents' inability to "provide food, clothing, and shelter" for T.M.H., not the parents' "criminal behavior." Id. at 9-10. Finally, although Mother acknowledges that it is "appropriate to consider a parent's habitual pattern of conduct" in termination cases, she nevertheless asserts that the trial court erroneously relied upon both parents' failure to complete reunification services in the prior CHINS cases involving T.M.H.'s siblings, rather than the evidence she presented concerning (1) her participation in a drug and alcohol program while incarcerated and (2) the fact there was "no evidence" that she was continuing to use drugs at the time of the termination hearing. Id. at 10.

Father likewise asserts that there is insufficient evidence to support the trial court's decision to terminate his parental rights. In so doing, Father argues that ACDCS "failed to put forth any evidence of any continued drug use during the pendence [sic] of the underlying CHINS case . . . nor did [ACDCS] put forth any evidence demonstrating that any use of illegal drugs interfered with [Father's] ability to parent his child." Appellant Father's Brief at 12. Father goes on to assert that "[w]ithout that evidence, [ACDCS's] concerns of his illegal drug use and his failure to comply with substance abuse counseling are unfounded." Id. Moreover, although Father acknowledges he has a history of "underemployment," he nevertheless states that he held a job from February through May of 2011 and lived in the same residence for two years prior to his most recent incarceration. Id. Father therefore insists that ACDCS's ongoing concerns regarding his

7

ability to maintain financial and housing stability once he is released from incarceration are unfounded and insufficient to support the trial court's termination order.

In terminating Mother's and Father's parental rights to T.M.H., the trial court made several detailed findings regarding both parents' history of deficient parenting, substance abuse, criminal activities, housing and income instability, and failure to benefit from past court-ordered reunification services involving T.M.H.'s older siblings. Specifically, the trial court acknowledged Mother's extensive history of involvement with ACDCS for over a decade, as well as her loss of parental rights to five of T.M.H.'s older siblings. The trial court also noted that Mother was arrested on prostitution charges in December 2010 after T.M.H.'s removal from the family home, and at the time of the termination hearing, was again incarcerated and facing new, pending forgery and receiving stolen property charges. As for Father, the trial court noted in its findings that Father was likewise incarcerated at the time of the termination hearing after having been convicted of class C felony non-support of a dependent child. The trial court went on to find that Father was sentenced to serve eight years of incarceration, with four years suspended, and had a projected release date not until April 2013.

As for both parents' participation in visitation with T.M.H. throughout the underlying proceedings, as well as their respective abilities to maintain a safe and stable home environment, the trial court found:

> 12. Despite being out of jail from January, 2011 through August 2011, [Mother] did not visit the child. From the testimony of Deb Muessing, SCAN's keeper of the records, the Court finds that [Mother] visited a total of three times of the fifteen visits that were scheduled. [Mother] last visited the child on December 16, 2010.

8

13. Between November and June, 2011 the Alleged Father was only in jail for the several weeks between January 2011 and February 8, 2011. However, during the period he was not incarcerated, he did not regularly visit the child. From the testimony of SCAN's Deb Muessing[,] the Court finds that the Alleged Father participated in seven (7) of the fifteen (15) scheduled visits. He last visited the child on April 7, 2011.

14. [T]he Alleged Father's visits were put "on hold" four times because he did not regularly visit. . . . The Alleged [F]ather did not complete drug and alcohol counseling services as required in the CHINS Parent Participation Plan and Dispositional Decree entered for the child's siblings. . . . The [ACDCS] is responsible for the protection of the child. Therefore, the requirement that the Alleged Father submit to a drug screen prior to the reinstatement of services was not unreasonable or overly burdensome.

15. When not incarcerated[,] the Mother and Alleged Father rented a bedroom in a home owned and occupied by a man and his daughter; individuals who have a substantiated history with [ACDCS].

Appellant Mother's Appendix at 8. Based on these and other findings, the trial court

concluded:

By the clear and convincing evidence[,] the court determines that the reasons for placement outside the home of the parents will not be remedied. The Mother and the Alleged Father are incarcerated on criminal charges. Each has a history of criminal charges and incarcerations establishing a pattern of criminogenic behavior. Neither completed the services ordered n the [CHINS] cases for the child's siblings. The Mother and the Alleged Father did not maintain regular contact with [ACDCS] during the pendency of the child's underlying CHINS case and failed to conform to the policy requirements for their respective supervised visits.

Id. at 9. A thorough review of the record reveals that abundant evidence supports the trial

court's findings and conclusions detailed above.

During the termination hearing, Stop Child Abuse Now ("SCAN") Family

Restoration Supervisor Deb Muessing and ACDCS case manager Tiffany King testified

regarding both parents' lack of regular participation in visitation with T.M.H. during the

9

underlying CHINS case, including multiple cancellations and/or no-shows for scheduled visits by both parents. King further described Mother's and Father's communication with ACDCS as "very limited" and "sporadic." Transcript at 75, 77. As for employment, King confirmed that both parents were unable to maintain steady employment, with Mother having never reported any employment since the time T.M.H. was removed from her care, and Father reporting only "odd jobs" without submitting any paystubs as proof of employment. Id. at 79. King also testified that Father never provided "any proof of services" or "documentation that he's completed any services on his own." Id. Finally, King informed the trial court that ACDCS recommended termination of both parents' parental rights to T.M.H. "due to the parents['] lack of compliance with services, um, the lack of appropriate housing, lack of paternity, lack of visiting and bonding . . . [and] ongoing criminal matters." Id. at 82.

"A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, this Court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." Castro v. State Office of Family & Children, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), trans. denied. After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings set forth above. These findings, in turn, provide ample evidence

to support the court's ultimate decision to terminate both Mother's and Father's parental rights to T.M.H. Mother's and Father's arguments to the contrary, emphasizing self-serving evidence and testimony regarding their past housing situations and lack of drug use while incarcerated rather than the evidence cited by the trial court in its termination order, amount to an invitation to reweigh the evidence, which we may not do. See In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Accordingly, we find no error.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.